**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

700 EDGEWATER DEVELOPMENT, LLC, a
Delaware limited liability company,

       Plaintiff,

v.

ZURICH     AMERICAN     INSURANCE
COMPANY,  a  New  York  corporation,
ALLIANZ GLOBAL RISKS US INSURANCE
COMPANY, a California corporation, ACE
AMERICAN  INSURANCE  COMPANY,  a
Pennsylvania corporation, and NATIONAL
FIRE & MARINE INSURANCE COMPANY, a
New Mexico corporation.

       Defendants.

_____/

**COMPLAINT**

Plaintiff, 700 Edgewater Development, LLC ("Plaintiff" or the "Insured"), hereby sues

Defendants, ACE American Insurance Company ("ACE"), Allianz Global Risks US Insurance

Company ("Allianz"), National Fire & Marine Insurance Company ("National") and Zurich

American Insurance Company ("Zurich") (ACE, Allianz, National and Zurich are collectively

referred to herein as the "Defendants") and states as follows.

I.      **INTRODUCTION**

1.      This action arises out of the construction of Missoni Baia, a luxury residential

condominium development consisting of two hundred forty-nine (249) residential condominium

units and certain amenities located at 777 N.E. 26th Terrace, Miami, Florida 33137 (the "Project"

or the "Insured Property").

2.      As the record developer of the Project, Plaintiff brings this action for breach of contract and declaratory relief against the Defendants who issued certain Builder's Risk insurance policies[1] to Plaintiff in order to indemnify Plaintiff from losses incurred in connection with direct physical loss and/or direct physical damage to property insured under the Policies.

## II.      PARTIES, JURISDICTION & VENUE

3.      Plaintiff is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. The members of Plaintiff are PPT Edgewater LLC, CHE Edgewater LLC, and OBE Edgewater LLC.

4.      ACE is and was at all relevant time herein (i) a Pennsylvania corporation with its principal place of business in Pennsylvania; (ii) authorized to issue insurance policies and conduct business in the State of Florida; and (iii) regularly issues insurance policies and conducts business in the State of Florida.

5.      Allianz is and was at all relevant time herein (i) a California corporation with its principal place of business in Illinois; (ii) authorized to issue insurance policies and conduct business in the State of Florida; and (iii) regularly issues insurance policies and conducts business in the State of Florida.

6.      National is and was at all relevant time herein (i) a New Mexico corporation with its principal place of business in New Mexico; (ii) authorized to issue insurance policies and conduct business in the State of Florida; and (iii) regularly issues insurance policies and conducts

---

[1] A true and correct copy of Builder's Risk Insurance Policy No. I11166647 001 issued by ACE (the "ACE Policy"), and any endorsements thereto, is attached hereto as **Exhibit A**. A true and correct copy of Builder's Risk Insurance Policy No. USE00079719 issued by Allianz (the "Allianz Policy"), and any endorsements thereto, is attached hereto as **Exhibit B**. A true and correct copy of Builder's Risk Insurance Policy No. 42-PBR-309265-01 issued by National (the "National Policy"), and any endorsements thereto, is attached hereto as **Exhibit C**. A true and correct copy of Builder's Risk Insurance Policy No. IM 6846519-00 issued by Zurich (the "Zurich Policy"), and any endorsements thereto, is attached hereto as **Exhibit D**. The ACE Policy, the Allianz Policy, the National Policy and the Zurich Policy, and any endorsements thereto, are collectively referred to herein as the "Policies."

business in the State of Florida.

7. Zurich is and was at all relevant time herein (i) a New York corporation with its principal place of business in Illinois; (ii) authorized to issue insurance policies and conduct business in the State of Florida; and (iii) regularly issues insurance policies and conducts business in the State of Florida.

8. This Court has personal jurisdiction over Defendants pursuant to: a) Section, 48.193(1)(a)(1), Florida Statutes, because Defendants operate, engage and carry on businesses in Florida; b) Section 48.193(1)(a)(4), Florida Statutes, because Defendants contracted to insure a person, property or risk located in within this state at the time of contracting; c) Section 48.193(1)(a)(7), Florida Statutes, because  breached a contract that required acts to be performed in Florida.

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because it involves a dispute between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest, attorneys' fees and costs.

10. Venue is proper in this District pursuant to: a) U.S.C. § 1391(b)(2) because the events and omissions giving rise to this action occurred in this District; and b) 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

### III. FACTUAL BACKGROUND

11. Plaintiff and Ant Yapi/Civic Joint Venture, LLC entered into a written Construction Agreement dated October 29, 2019 (the "Construction Agreement") for the construction of the Project, pursuant to which Plaintiff obtained the Policies from Defendants to protect Plaintiff against, among other things, delay in completion losses incurred during a delay, and caused by

direct physical loss and/or direct physical damage to the Project.

12.     On or about April 4, 2021, differential settlement caused direct physical loss and/or direct physical damage to the Insured Property (the "April 4 Event").

13.     The April 4 Event caused a delay of at least sixteen (16) months in the Insured Property's receiving a Temporary Certificate of Occupancy ("TCO"), which delayed Plaintiff's ability to begin selling units in the Project and in turn caused significant damages to the Plaintiff, including physical loss and damage to the property and delay in completion damages.

14.     The Policies are Quota Share Policies in which Zurich is the Lead Insurer. *See* Ex. D, Quota Share Provision, pg. 1 of 2. The Policies state in relevant part:

> Each of the Quota Share Insurers Shown in the Schedule above (herein referred to as Insurers) agrees to insure for the applicable Quota Share percentage share show in the Schedule above, for each loss covered under this Policy. The liability of each Insurer will be several but not joint. No insurer will assume any liability beyond its respective percentages share of liability for any loss.

*See Id.* Each of the four Insurers are responsible for 25% of any covered loss. *Id.*

15.     The Policies provide the following duties in the event of loss or damage:

> The Named Insured must see that the following are done in the event of loss or damage to covered property:

1.  Notify the police of a law that may have been broken.

2.  Give the Company prompt notice of the loss or damage, including a description of the property involved, as soon as practicable, but not later than 60 days after the loss or damage becomes known to the Named Insured.

3.  As soon as possible, give the Company a description of how, when and where the loss or damage occurred.

4.  Take all reasonable steps to protect, recover or save the Covered Property from further damage. If feasible, set the damaged property aside and in the best possible order for examination. Also, keep a record of expenses for emergency and temporary repairs for consideration in the settlement of the claim.

5.  As often as may be reasonably required, permit the Company to inspect the property

proving the loss or damage and permit the Company to make copies of the Insured's books and records.

6. Permit the Company to question any Insured, the Insured's employees or agents under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the loss or damage, including an Insured's books and records. In the event of this examination, an Insured's answers must be signed or attested to by a notary public or certified court reporter.

7. Give the Company a signed sworn statement of loss containing the information necessary to investigate the claim. If requested by the Company, the Company will supply the necessary forms. The Named Insured must return these completed forms within 60 days of the request or required by law.

8. Cooperate with the Company in the investigation or settlement of the claim.

*See* Ex. D, Zurich Completed Value Builders Risk General Conditions, Sec. J, pgs. 2-3 of 9.

16.     In addition to these requirements, the Policies also add the following duties in the event of a loss:

1. The Named Insured will give the Lead Insurer and the Third Party Adjuster prompt notice of the loss or damage.

2. Upon receiving notice of loss or damage, the Lead Insurer will advise the Broker of Record will notify the other Insurers as soon as practicable, but not later than 48 hours after the loss or damage becomes known to the Broker of Record.

3. The Lead Insurer will cooperate with the other Insurers:

   a. In the appointment and retention of third parties with respect to the handling of the loss adjustment, including accounting consultants, engineers and other experts as necessary. All such third parties shall act on behalf of and represent the interests of all Insurers. In no event will the Lead Insurer act unilaterally in the appointment of third parties; and

   b. In all investigations, negotiations, adjustments and settlements in connection with a claim under this policy.

4. The Lead Insurer will coordinate all activities involving any claim in accordance with the terms and conditions set forth in this Policy. The loss payment and claim expense will be shared by the Insurers according to their Quota Share Participation shown in the Schedule above.

5. All Insurers agree to use the Third Party Adjuster shown in the Schedule above for the

adjustment of all claims under this Policy. The Third Party Adjuster shall act on behalf of the interests of all Insurers when communicating with the Insured. This Assignment may only be changed by mutual consent of the first Named Insured when communicating with the Insured and the Insurers shown in the Schedule above.

6. Any defense of a claim available to one of the Insurers will be available to all of the Insurers.

7. The Insurers shall have the right to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the claim and are entitled to receive all information and claim related documentation obtained by the Lead Insurer with respect to any claim.

*See* Ex. D, Quota Share Provision, Sec. I, pg. 2 of 2.

17.     Beginning in 2023 (once the Plaintiff was initially able to calculate its damages related to the April 4 Event), Plaintiff began issuing and providing notice of loss or damage and Sworn Statements in Proof of Loss for Undisputed Portion of Delay in Completion Loss to the Defendants (collectively referred to herein is as the "Sworn Statements of Loss"). In these notices of loss or damage and Sworn Statements of Loss, Plaintiff provided the Defendants with prompt notice of the loss or damage and included all the detail required by the Policies as it could be calculated at that time. Plaintiff issued several notices of loss or damage and Sworn Statements of Loss relating to the April 4 Event with the last one being issued in March of 2026.

18.     By Plaintiff providing these Sworn Statements of Loss as well as providing notice of its loss or damages, Defendants received prompt notice of all covered losses due to the April 4 Event that were able to be calculated when each notice of loss or damage or Sworn Statement of Loss was issued.

19.     The final Sworn Statement of Loss demonstrates that Plaintiff incurred a total loss of approximately Fifty-Five Million Seven Hundred Forty-One Thousand Three Hundred Twenty-Eight and 91/100 Dollars ($55,741,328.91) as a result of the April 4 Event. A true and correct copy of the Sworn Statement of Loss issued in March of 2026 is attached hereto as **Exhibit E.** This total

amount of damages includes both the direct physical loss and damage to the Property as well as delay in completion damages.

20.     The notices of loss or damage and Sworn Statements of Loss were timely submitted and complied with all aspects and conditions of the Policies as set forth above and at all times thereafter, in accordance with the terms of the Policies.

21.     A representative of the Plaintiff was in constant communication with the Third-Party Adjuster, McLarens, LLC (*see* Ex. D, Quota Share Provision, pg. 1 of 2), relating to the losses associated with the April 4 Event. Plaintiff has cooperated fully with Defendants' investigation of the April 4 Event

22.     Plaintiff has complied with all of the aforementioned requirements set forth in the Policies.

23.     Confirming Plaintiff's compliance with the requirements, to date, Defendants have made payments totaling Thirty-Three Million Nine Hundred Fifty-Six Thousand Fourteen and 69/100 Dollars ($33,956,014.96) to the Insured.

24.     With regards to the remaining unpaid amounts, Plaintiff first advised Defendants of the more than Twenty-Two Million Dollars outstanding on its claim related to the April 4 Event in January of 2025. Despite being on notice of this claim for more than a year, Defendants on multiple occasions have refused and failed to pay the remaining Twenty-Two Million Four Hundred Thirty Thousand Eight Hundred Fifty-Eight and 82/100 dollars ($22,430,858.82) of the Fifty-Five Million Seven Hundred Forty-One Thousand Three Hundred Twenty-Eight and 91/100 Dollars ($55,741,328.91) total claim. *See* Ex. E.

25.     On March 24, 2026 and again on March 31, 2026,[2] Plaintiff submitted the final Sworn Statements of Loss in accordance with the Policies asserting damages for which it has not been compensated. *See* Ex. E. In the Sworn Statement of Loss, Plaintiff attests that under the Policies, Defendants have failed to pay the remaining Twenty-Two Million Four Hundred Thirty Thousand Eight Hundred Fifty-Eight and 82/100 dollars ($22,430,858.82) to the Insured relating to the April 4 Event pertaining to Delay in Completion damages and Direct Physical Loss damages.

26.     Additionally, Plaintiff submitted the Property Insurance Notices of Intent to Initiate Litigation against all of the Defendants in accordance with Section 627.70152, Florida Statutes.

## IV.     THE BUILDER'S RISK POLICIES AND COVERAGE FOR THE LOSS

27.     Defendants issued the Policies to Plaintiff for coverage of the Insured Property, which includes coverage for all of the damages the Plaintiff is seeking. The Policies' complete terms, conditions and endorsements are incorporated by reference herein. *See* Ex. A – D.

28.     At all relevant times herein, Plaintiff was the Insured under the Policies, as defined in the Policies. *Id.*

29.     At all relevant times herein, the Project was Insured Property under the Policies, as defined in the Policies. *Id.*

30.     ***First***, the Policies provide coverage "for direct physical loss of or damage to "builders risk property" caused by a "covered cause of loss" which such "builders risk property" is": (a) At the "project site"; (b) In transit; or (c) At a "temporary offsite location". *See* Ex. D, Zurich Completed Value Builders Risk Coverage Form, Sec. A(1), pg. 1 of 16.

31.     The Policies define "builders risk property" as "(a) "Property under construction";

---

[2] This final Sworn Statement of Loss was issued to the Third-Party Adjuster, McLarens LLC on March 24, 2026. To ensure all Defendants received the Sworn Statement of Loss in case it was not sent by McLarens to them, it was sent directly to all Defendants on March 31, 2026.

(b) "Landscaping materials"; and (c) "Temporary Works", owned by the Insured or owned by others which are in the Insured's care, custody or control, or that the Insured is contractually responsible for and are included in the "insured project." *Id.* at Sec. J(1), pg. 12 of 16.

32.     Specifically, the Policies define "Property under construction" and "Temporary Works" as follows:

    i.    "Property under construction" means: "(a) Materials and supplies; (b) Fill, backfill or fill additives; (c) Equipment and machinery; (d) Furniture and fixtures; (e) "Electronic Hardware" and software; and (f) Other property as included in the written construction contract, that is intended to become a permanent part of the "insured project"." *Id.* at Sec. J(24), pg. 15 of 16.

    ii.    "Temporary Works" means: "(a) Installations or engineered solutions used in the course of construction to provide access, protection, support or services to the Insured at the "insured project"; or (b) Temporary service, repair or support for the "insured project" until the permanent works have achieved a state of completion allowing the temporary service, repair or support to be removed." *Id.* at Sec. J(28), pg. 16 of 16.

33.     The Policies define "covered cause of loss" as "direct physical loss or damage, not otherwise excluded or limited in this Policy, which actually occurs during the Policy Term." *Id.* at Sec. J(6), pg. 13 of 16.

34.     The Policies define "Policy Term" as the period of time from October 31, 2019 through February 16, 2022. *See* Ex. D, Declarations Sec. 6.0, pg. 1 of 4.  The April 4 Event took place on April 4, 2021 within the Policy Term.

35.     The April 4 Event resulted in direct physical loss and/or direct physical damage to builders risk property within the Insured Property during the Policy Term and therefore, such loss and/or physical damage is covered by the Policies. More specifically, the differential settlement caused direct physical loss and/or direct physical damage to the Insured Property.

36.     ***Second***, the Policies provide coverage for the following costs due to delay in completion of the Insured Project:

1. Business Interruption
   The Company will pay for the actual loss of "business interruption" sustained by the Named Insured shown in the Schedule above due to the delay in completion of the "insured project" shown in the Schedule above during the "period of indemnity". This delay in completion must be caused by direct physical loss of or damage to Cover Property at the "project site", in transit, or at a "temporary offsite location". The loss or damage must be caused by a "covered cause of loss". The most the Company will pay in any one "occurrence" is the Limit of Liability shown in the Schedule above for Business Interruption.

2. Rental Value
   The Company will pay for the actual loss of "rental value" sustained by the Named Insured shown in the Schedule above due to the delay in completion of the "insured project" shown in the Schedule above during the "period of indemnity". This delay in completion must be caused by direct physical loss of or damage to Covered Property at the "project site", in transit, or at a "temporary offsite location". The loss or damage must be caused by a "covered cause of loss". The most the Company will pay in any one "occurrence" is the Limit of Liability shown in the Schedule above for Rental Value.

3. Soft Costs
   The Company will pay for the actual and necessary "soft costs" incurred by the Named Insured shown in the Schedule above due to the delay in completion of the "insured project" during the "period of indemnity". This delay in completion must be caused by direct physical loss of or damage to Covered Property at the "project site". The loss or damage must be caused by a "covered cause of loss". The most the Company will pay in any one "occurrence" is the Limit of Liability shown in the Schedule above for Soft Costs.

4. Additional Interest and Financing Expenses
   The Company will pay for the actual and necessary "additional interest and financing expenses" incurred by the Named Insured shown in the Schedule above due to the delay in completion of the "insured project" during the "period of indemnity". This delay in completion must be caused by direct physical loss of or damage to Covered Property at the "project site". The loss or damage must be caused by a "covered cause of loss". The most the Company will pay in any one "occurrence" is the Limit of Liability shown in the Schedule above for Additional Interest and Financing Expenses.

*See* Ex. D, Delay in Completion Coverage Endorsement, Sec. 7(A), pg. 2 of 7.

37.    The Policies define "business interruption" as ""gross earnings" less non-continuing expenses" and, in turn, defines "gross earnings" as "the sum of: (a) Total net sales value of production; (b) Total net sales of "merchandise"; and (c) Other earnings derived from the

Named Insured's business activities, other than "rental income", from the planned operation of the "insured project" upon occupancy" less the costs of certain suppliers and materials incorporated into the Insured Project. *Id.* at Sec. J, pg. 6 of 7.

38.     The Policies define "additional interest and financing expenses" as  "(a) additional interest charged by lenders to extend or renew interim financing; (b) interest of principal payments on money borrowed by the Named Insured for the "insured project" that are due and must be paid whether or not the "insured project" is operational; and (c) additional costs incurred by the Named Insured to obtain new financing for the "insured project" should the financing expire or be nonrenewed, including additional loan fees incurred to rearrange financing necessary to complete the "insured project."" *Id.*

39.     The Policies define "soft costs" as "(a) Legal and accounting expense; (b) Architects, engineers and design professionals fees; (c) Real estate taxes, ground rents and property tax assessments; (d) Insurance premiums; (e) Project administration expense and general overhead such as temporary leasing or rental expense, clerical expense and other similar expenses; (f) Advertising and promotional expense; (g) Commissions or fees for renegotiating leases; (h) Lost commitment fees from prospective tenants or purchasers; (i) Testing and quality control costs; and (j) Any other applicable expenses as described in the Schedule above for Additional Soft Costs." *Id.* at pg. 7 of 7.

40.     The Policies define "period of indemnity" as "the period of time that begins immediately following the "anticipated date of completion" for the "insured project". The "period of indemnity" ends on the earlier of: (a) the applicable number of days shown in the Schedule above for Period of Indemnity; or (b) the actual date on which the commercial operations or use and occupancy con commence with the exercise of due diligence." *Id.*

41.     The Policies define "anticipated date of completion" as "the later of: (a) The Anticipated Date of Completion shown in the Schedule above on which the work is scheduled to be completed for the commencement of the commercial operations or the use and occupancy of the "insured project"; or (b) The anticipated completion date shown in the most current "construction schedule", if applicable, modified to a date later in time than the effective date of this Delay in Completion Coverage." *Id.* at pg. 6 of 7.

42.     The Policies define "construction schedule" as "the time table, critical path, time line, bar chart or other scheduling tool documenting the start and completion dates of the operations required for construction of the "insured project"." *Id.*

43.     The direct physical loss and/or direct physical damage to Insured Property due to the April 4 Event caused delays to Insured Property resulting in Plaintiff incurring damage due to Business Interruption, Rental Value, Soft Costs and Additional Interest and Financing Income, as those terms are defined in the Policies.

44.     Such damages and costs occurred during the period of indemnity, as defined in the Policies, and therefore, are covered by the Policies.

**V.     DEFENDANTS' FAILURE TO ACKNOWLEDGE COVERAGE AND INDEMNIFY PLAINTIFF FROM ITS DELAY IN COMPLETION LOSSES**

45.     Following Plaintiff's submission of the notices of loss or damage and Sworn Statements of Loss to the Defendants, Defendants retained a consulting firm, J.S. Held, LLC ("JSH"), to evaluate the delays to the Project and the TCO date caused by the April 4 Event to the Insured Property.[3]

46.     The granting of a TCO to certain portions of a building enables owners such as

---

[3] A true and correct copy of the report entitled April 4, 2021 – Differential Settlement Analysis of Delay to Completion Date dated May 22, 2025, prepared by JSH (the "JSH Report") is attached hereto as **Exhibit F**.

Plaintiff to start closing on the sales of units in the building that were granted a TCO, or in the portions thereof that were granted a Partial TCO. *See* Sec. 110.3, Florida Building Code.

47. The JSH Report confirms that commercial use and occupancy of portions of the Project were delayed and that those delays were caused by direct physical loss and/or direct physical damage from the April 4 Event to the Insured Property during the period of insurance.

48. Specifically, the JSH Report demonstrates that (i) but for the April 4 Event, the delayed portion(s) of the Insured Property would have received a TCO and been put to its intended use by February 10, 2022, and (ii) the April 4 Event caused significant damage to the Insured Property and prevented occupancy of the delayed portion(s) of the Insured Property until at least June 9, 2023. This provides a total delay of sixteen months from the TCO date of February 10, 2022 pre-April 4 Event.

49. The JSH Report concludes that portions of the Project were delayed in being put to their intended use, because of direct physical loss and/or direct physical damage (the April 4 Event) to Insured Property.

50. Despite being on notice of these damages, Defendants failed to indemnify Plaintiff from its direct physical loss, direct physical damages and/or delay in completion losses as provided for by the Policies.

51. Plaintiff has sought payment and indemnification from Defendants under the terms of the Policies due to the covered losses incurred in connection with the April 4 Event.

52. To date, Defendants have failed to acknowledge coverage for Twenty-Two Million Four Hundred Thirty Thousand Eight Hundred Fifty-Eight and 82/100 dollars ($22,430,858.82) of Plaintiff's losses due to the April 4 Event.

53. The April 4 Event caused direct physical loss and/or direct physical damage to

Insured Property.

54.     The Insured Property experienced delays due to the April 4 Event.

55.     During the delays to Insured Property caused by the April 4 Event, Plaintiff incurred delay in completion losses, as defined in the Policies.

56.     Pursuant to the terms and conditions of the Policies, Plaintiff is entitled to delay in completion losses incurred during a delay and caused by direct physical loss and/or direct physical damage to Insured Property.

57.     As a result of Defendants' refusal to indemnify the Insured under the Policies, the Insured has retained undersigned counsel and is obligated to pay them a reasonable fee in connection with the prosecution of this action pursuant to Section 627.428, Florida Statutes.

58.     All conditions precedent to this action have been performed, have occurred, have been waived, or have otherwise been satisfied.

59.     Plaintiff is entitled to recover its attorneys' fees from Defendants pursuant to Section 627.428, Florida Statutes.

**COUNT I – BREACH OF CONTRACT**
*(All Defendants)*

60.     Owner incorporates by reference the allegations set forth in paragraphs 1 through 59 above as if fully set forth herein.

61.     The Policies are insurance contracts under which Defendants agreed to indemnify Plaintiff for covered losses.

62.     The Policies provide insurance coverage for delay in completion losses incurred during a delay and for damages caused by direct physical loss and/or direct physical damage to Insured Property during the policy period of the Policies.

63.     At all relevant times herein, Plaintiff was the Insured under the Policies.

64.     At all relevant times herein, the Project was Insured Property under the Policies.

65.     The April 4 Event occurred during the policy period of the Policies.

66.     The April 4 Event resulted in direct physical loss and/or direct physical damage, as defined in the Policies, to Insured Property.

67.     The April 4 Event caused a delay, as defined in the Policies, to Insured Property.

68.     Plaintiff incurred delay in completion losses, as defined in the Policies, during and in connection with the delay(s) caused by the April 4 Event.

69.     Defendants failed to perform their obligations under the Policies and have materially breached the Policies by failing to indemnify the Insured for delay in completion losses incurred by the Insured during a delay and caused by direct physical loss and/or direct physical damage to Insured Property during the policy period of the Policies.

70.     As a direct, foreseeable and proximate result of Defendants' breaches of the Policies, the Insured has suffered harm.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants and that Plaintiff be awarded its damages, including consequential, special and indirect damages, attorneys' fees, costs and other remedies provided for in the Policies, as well as pre-judgment interest, post-judgment interest, and any other relief that the Court deems proper or just.

**COUNT II – DECLARATORY JUDGMENT**
*(All Defendants)*

71.     Owner incorporates by reference the allegations set forth in paragraphs 1 through 59 above as if fully set forth herein.

72.     Plaintiff maintains that (i) the Policies provide coverage for delay in completion losses during a delay and for damages caused by direct physical loss and/or direct physical damage

to Insured Property; and (2) that Defendants are required to indemnify the Insured under the Policies for delay in completion losses incurred by the Insured during the delays caused by the April 4 Event.

73.     Defendants have failed to acknowledge coverage and failed to indemnify Plaintiff from its delay in completion losses and/or damages caused by direct physical loss or direct physical damage as provided for by the Policies.

74.     As a consequence of the foregoing contentions, a bona fide dispute exists between the Insured and Defendants regarding the extent of the Insured's rights, and Defendants' obligations, under the Policies.

75.     Until this dispute is resolved, the Insured and Defendants will remain in doubt as to their respective rights and obligations under the Policies and applicable facts.

76.     The Insured, therefore, seeks and is entitled to a declaration that:

    a.  the Policies provide coverage for delay in completion losses incurred during a delay and damages caused by direct physical loss and/or direct physical damage to Insured Property during the period of indemnity; and

    b.  the Defendants are required to indemnify the Insured for delay in completion losses, as defined in the Policies, incurred during the delay(s) caused by the April 4 Event.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment declaring the statements set forth in paragraph 76 of the Complaint, award Plaintiff its attorneys' fees, and grant Plaintiff any other relief as this Court deems just and appropriate.

Dated:  April 7, 2026

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
*Counsel for Plaintiff*


 */s/ Thomas J. Heisler*
MICHAEL J. THOMAS
Florida Bar No. 21309
THOMAS R. HEISLER
Florida Bar No.: 1029852
ROBERT S. GALBO
Florida Bar No. 106937
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone No.: (305) 579-0500
Email: Michael.thomas@gtlaw.com
Thomas.heisler@gtlaw.com
Galbor@gtlaw.com